IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES,<br><br>Plaintiff,<br><br>vs.<br><br>BRENDA BURMAN, Commissioner, U.S. Bureau of Reclamation; DAVID BERNHARDT, Secretary, U.S. Department of Interior,<br><br>Defendants. | CV 20-22-GF-KLD<br><br>ORDER |

Plaintiff Alliance for the Wild Rockies, Inc. ("Alliance"), brings this action under the Endangered Species Act ("ESA") challenging the Bureau of Reclamation's ("Reclamation") alleged ongoing, unpermitted take of bull trout through its operation of the Milk River Irrigation Project located east of Glacier National Park. Reclamation has moved to dismiss Alliance's complaint under Fed. R. Civ. P. 12(b)(1), arguing Alliance's claim is moot. (Doc. 7.) In the alternative, Reclamation requests a stay of proceedings. For the following reasons, Reclamation's motion is DENIED.

**I.     Background**

Alliance filed this action on March 25, 2020 challenging Reclamation's

1

unpermitted incidental take of bull trout in violation of under Section 9 of the ESA. (Doc. 1.) Alliance alleges Reclamation's water control and delivery structures in the St. Mary River drainage, as part of the Milk River Irrigation Project, are negatively affecting the native fish population resulting in the mortality of bull trout, a threatened species. (Doc. 1 at ¶¶ 11-23.)

The Milk River Irrigation Project was authorized in 1903 to provide for irrigation in the lower portion of the Milk River basin in northcentral Montana. (Doc. 8 at 10.) Reclamation operates and maintains the project which consists of multiple water diversion structures including the Lake Sherburne Dam and Reservoir, the Swiftcurrent Creek Dike, the St. Mary Diversion Dam and Headworks, the St. Mary Canal, and appurtenant structures. (Doc. 8 at 11; Doc. 8-1 at 7-20.) These facilities are all located within the St. Mary Unit of the Milk River Irrigation Project and are the facilities at issue in this matter. (Doc. 8-1 at 16.)

The water diverted through these structures originates in Glacier National Park. The headwaters of the St. Mary River originate at Gunsight Lake and flow northeast before entering St. Mary Lake. Upon leaving the lake, St. Mary River flows onto the Blackfeet Reservation and then enters Lower St. Mary Lake. The river then meanders through the Canadian border to St. Mary Reservoir. (Doc. 1 at ¶¶ 11-13.)

The St. Mary Diversion Dam is located downstream from Lower St. Mary Lake and diverts water from the St. Mary River into the unscreened St. Mary Canal, through which it is carried to the Milk River and is then used for agriculture, drinking water, recreation, and wildlife habitat in the Milk River Basin. (Doc. 8 at 11.) Additionally, Swiftcurrent Creek has been diverted into Lower St. Mary Lake causing water released from the Lake Sherburne Reservoir to also be diverted into St. Mary Canal. (Doc. 1 at ¶ 18.) Each year during the fall and winter seasons the Sherburne Dam is closed to allow the reservoir to refill. While the dam is closed, Swiftcurrent Creek is left dry from the dam to the Boulder Creek confluence. (Doc. 1 at ¶¶ 19-20.)

The United States Fish and Wildlife Service ("USFWS") listed bull trout (*Salvelinus confluentus*) within the coterminous United States as a threatened species in 1999. 64 Fed. Reg. 58,910. Bull trout living in the St. Mary drainage have been affected by Reclamation's operations in the St. Mary Unit. (Doc. 8 at 11.) For example, bull trout entrained in Swiftcurrent Creek face mortality due to the annual dewatering of the creek to allow the reservoir to refill. (Doc. 8 at 12; Doc. 1 at ¶ 21.)

The parties do not dispute that Reclamation's operations are subject to the requirements of the ESA. It is also undisputed that taking bull trout is a violation of

3

the ESA, and Reclamation does not have an incidental take permit or statement from the USFWS which would exempt it from violating the ESA. 16 U.S.C. § 1539(a)(1)(B). However, Reclamation contends that it is currently engaged in formal consultation with the USFWS regarding bull trout in the St. Mary Unit. (Doc. 8 at 14.) Reclamation predicts consultation will culminate in the USFWS' completion of a Biological Opinion ("BiOp"), which could result in the issuance of an incidental take permit for the St. Mary Unit by September 6, 2020. (Doc. 8 at 14.)

## II. Legal Standard

Reclamation moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(1). A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction over the action. As the party asserting jurisdiction, the plaintiff bears the burden of proving its existence. *Kingman Reef Atoll Investments, L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008.) The court will presume jurisdiction is lacking until the plaintiff proves otherwise. *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989).

In considering a 12(b)(1) motion challenging the facts supporting subject-matter jurisdiction, a court may consider extra-pleading materials submitted by the parties. *Assoc. of American Medical Colleges v. United States*, 217 F.3d 770, 778-

79 (9th Cir. 2000); *see also McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) ("Moreover, when considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction."). The court may weigh the evidence without converting the motion into one for summary judgment. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A federal court is one of limited jurisdiction; it must dismiss a case upon concluding it lacks jurisdiction. *High Country Resources v. F.E.R.C.*, 255 F.3d 741, 747 (9th Cir. 2001).

### III. Discussion

#### A. The ESA

Congress enacted the ESA to "provide a program for the conservation of . . . endangered species and threatened species," and to "provide a means whereby the ecosystems upon which endangered species and threatened species may be conserved[.]" 16 U.S.C. § 1531(a)(3). The ESA implements its goal of recovering threatened and endangered species to the point where protective measures are no longer needed through Sections 7 and 9 of the Act. *See Babbit v. Sweet Home Chapter of Cmtys. For a Great Or.*, 515 U.S. 687, 699 (1995) (Congress passed the ESA "to halt and reverse the trend toward species extinction, whatever the cost.").

Section 9 of the ESA prohibits any person from "taking" an endangered species. 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The USFWS has extended the ESA's "take" prohibition to certain threatened species, including bull trout. 50 C.F.R. § 17.31(a). The USFWS, however, may find the taking of a species to be "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). In such a situation, the USFWS may exempt the "incidental take" from Section 9's take prohibition. The incidental take exemption is typically authorized through an incidental take permit during the Section 7 consultation process. 16 U.S.C. § 1536(b)(4).

Section 7 of the ESA requires federal agencies to ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of a species' critical habitat. 16 U.S.C. § 1536(a)(2). If an agency's action may affect a listed species or critical habitat, the agency must engage in consultation with the consulting agency, the USFWS in this case. 16 U.S.C. § 1536(b). Consultation begins with the preparation of a biological assessment and culminates in the USFWS' issuance of a BiOp assessing whether the action will likely jeopardize the

6

listed species or result in destruction or adverse modification of its critical habitat. 50 C.F.R. § 402.14(g) – (h).

If the USFWS concludes that the agency action will involve "the taking of an endangered or a threatened species *incidental* to the agency action [,]" it must provide an Incidental Take Statement ("ITS"). 16 U.S.C. § 1536(b)(4) (emphasis added). The ITS specifies the impact of the incidental taking on the species, specifies reasonable and prudent measures necessary or appropriate to minimize the impact, and sets forth the terms and conditions the federal agency must comply with. 16 U.S.C. § 1536(b)(4)(C). "As long as any takings comply with the terms and conditions of the [ITS], the action agency is exempt from penalties for such takings." *Oregon Natural Resources Council v. Allen*, 476 F.3d 1031, 1034 (9th Cir. 2007).

B. Motion to Dismiss

Reclamation moves to dismiss Alliance's complaint based on mootness. Reclamation and the USFWS are currently engaged in formal consultation regarding bull trout in the St. Mary Unit. The consultation is expected to result in the issuance of a BiOp and ITS by September 6, 2020. (Doc. 8 at 15.) Because an ITS would exempt Reclamation from the ESA's take prohibition, Reclamation argues that Alliance's Section 9 claim will be moot once USFWS issues an ITS.

Reclamation further asserts that the relief Alliance seeks will no longer be relevant once the USFWS issues an ITS, and declaratory relief alone is insufficient to provide the Court with jurisdiction in the absence of a ripe controversy.

Even if the Court finds Alliance's claim is not yet moot, Reclamation argues the Court should dismiss Alliance's complaint because it is prudentially moot. (Doc. 8 at 17.) Prudential mootness "permits a court to dismiss [a case] not technically moot if circumstances have changed since the beginning of litigation that forestall any occasion for a meaningful relief[.]" *Deutsche Bank Nat. Trust Co. v. F.D.I.C.*, 744 F.3d 1124, 1135 (9th Cir. 2014). The doctrine of prudential mootness allows a court to exercise its discretion to withhold its power to provide relief "[w]here it is so unlikely that the court's grant of remedy will actually relieve the injury[.]" *California Trout, Inc. v. United States Bureau of Reclamation*, 115 F. Supp. 3d 1102, 1116 (C.D. Cal. 2015) (quoting *Nasoordeen v. F.D.I.C.*, 2010 WL 1135888, * 6 (C.D. Cal. Mar. 17, 2010)).

Reclamation argues that because it is in the process of completing formal consultation with the USFWS and obtaining a BiOp and ITS, the Court should allow it to complete its efforts before adjudicating this case on the merits. Reclamation additionally argues that it is working with the USFWS to develop and evaluate interim measures to minimize any harm to bull trout. Therefore,

Reclamation contends that a finding of prudential mootness would conserve judicial resources and address Alliance's relief sought.

Also relevant to the harm analysis is the current structural failure on the St. Mary Canal that has rendered it temporarily inoperable. (Doc. 8 at 14.) On May 17, 2020, a drop structure on the canal failed requiring the canal to be dewatered for repairs. Reclamation has therefore ceased water diversion through St. Mary Dam into the canal and will not resume diversion until repairs have been completed. Repairs are currently predicted to be completed by August 31, 2020. (Doc. 11 at 3.) Due to the canal's temporary closure, Reclamation argues it is possible the USFWS will issue a BiOp and ITS before any bull trout could be harmed by recommencing operation of the St. Mary Canal this season.

Mootness is a jurisdictional issue requiring the Court to determine whether a case or controversy exists under Article III of the Constitution. *Maldonado v. Lynch*, 786 F.3d 1155, 1160 (9th Cir. 2015). A case must present a live controversy to resist dismissal for mootness. *Maldonado*, 786 F.3d at 1160. "The party asserting mootness bears the burden of establishing that there is no effective relief that the court can provide." *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006). The burden to establish mootness is heavy. "[A] case is not moot where *any* effective relief may be granted." *Forest Guardians*, 450 F.3d at 461 (emphasis

9

in original).

Reclamation has not established that Alliance is without any effective relief. First, although Reclamation and the USFWS are apparently working together to produce a BiOp and ITS by early September, culmination of those efforts by the proposed deadline is uncertain. *See* Doc. 8-5 ¶¶ 2-4 ("I *anticipate* that the biological opinion, and any incidental take statement, will be completed by September 6, 2020.") (emphasis added). Additionally, the ESA permits the USFWS and Reclamation to mutually agree to extend the consultation time period. 50 C.F.R. § 402.14(e). The USFWS' estimated date of completion is too speculative to conclude this case will be moot come September 6, 2020.

Reclamation also presumes the USFWS will issue an ITS along with its BiOp. Pursuant to the ESA, however, the USFWS will only issue an ITS with the BiOp if it "concludes that an action . . . and the resultant incidental take of listed species will not violate section 7(a)(2)[.]" 50 C.F.R. § 402.14(i)(1); *see also* Doc. 8-5 ¶¶ 2-4 ("I anticipate that the biological opinion, *and any accompanying incidental take statement*, will be completed by September 6, 2020.") (emphasis added). Reclamation asks this Court to speculate as to both the timeframe and outcome of the USFWS' obligations under the ESA in order to find this action moot. The Court declines to do so.

10

Finally, Alliance has not only shown past take of bull trout, but also the likelihood of future imminent harm. Bull trout in the St. Mary Unit are fatally affected by the Milk River Irrigation Project in a variety of ways, including entrainment into St. Mary Canal. (Doc. 9-1 at 8-9.) Reclamation data shows that entrainment occurs from March through September, with the highest rates of entrainment occurring in April and May. (Doc. 9-1 at 17.) Therefore, even if the USFWS issues a BiOp and ITS by September 6, 2020, take of bull trout in violation of Section 9 will likely occur before that date. This is true even if the canal is not repaired until late August since entrainment of bull trout occurs through September. (Doc. 9-1 at 17.) Because declaratory and/or injunctive relief may be appropriate and would provide Alliance effective relief by prohibiting Reclamation from violating the ESA, Alliance's Section 9 claim is not moot. *See Northwest Envtl. Defense Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988) (action challenging agency's failure to ensure viability of salmon fisheries was not moot at the end of salmon season where a declaratory judgment would resolve "a dispute which has present and future consequences."). *See also*, *Greenpeace Found. v. Mineta*, 122 F. Supp. 2d 1123, 1129 (D. Haw. 2000) (Section 9 claim was not moot merely because agency temporarily ceased harmful conduct because agency did not show "that the harm underlying Plaintiff's Section 9 . . . claim[] has

11

been eradicated, never to return.").

Reclamation's alternative argument that Alliance's claim is prudentially moot is also unavailing. As pointed out by Alliance, the Ninth Circuit has yet to adopt prudential mootness "*per se*." *Maldonado*, 786 F.3d at 1161 n.5 ("we have applied prudential mootness only in the bankruptcy context, when there are no assets left to distribute."). Additionally, the circumstances of this case do not foreclose Alliance's ability to obtain meaningful relief. *See Deutsche Bank Nat. Trust Co.*, 744 F.3d at 1135 (prudential mootness allows a court to dismiss a case not yet moot if there is no "occasion for meaningful relief"). If Alliance prevails on its Section 9 claim it may obtain the relief it seeks: a declaration that Reclamation is violating the ESA and an injunction requiring Reclamation to abate its take of bull trout.

Reclamation argues that because it is in the process of completing formal consultation with the USFWS and obtaining a BiOp and ITS, it will soon provide relief to Alliance on its own volition. However, as previously discussed, the Court would have to engage in conjecture to presume the consultation will eliminate Alliance's ability to receive any meaningful relief. Reclamation's actions continue to threaten bull trout and it is indeterminate when Alliance's alleged harm will be remedied. The Court declines to find Alliance's claim to be prudentially moot

under these circumstances. *See California Trout, Inc.*, 115 F. Supp. 3d at 1116 (prudential mootness inappropriate where Reclamation had not yet finalized or implemented remedies plaintiff sought) and *Yurok Tribe v. United States Bureau of Reclamation*, 231 F. Supp. 3d 450, 465 (N.D. Cal. 2017) (claims not prudentially moot although agencies were engaged in informal consultation because plaintiffs sought injunction to cease harmful activity until formal consultation was completed); *see also Alliance for the Wild Rockies v. Marten*, 200 F. Supp. 3d 1129, 1130-31 (D. Mont. 2016) (declining to find ESA claims moot merely because they may become moot as litigation proceeds).

  C.  Reclamation's Alternative Request to Stay the Litigation

Reclamation requests the Court stay the proceedings in this case in the alternative of dismissal based on mootness or prudential mootness. (Doc. 20 at 8.) Reclamation argues a stay will conserve judicial resources and will not result in harm to bull trout since the St. Mary Canal is currently non-operational. Reclamation additionally asserts that a stay is appropriate since its consultation with the USFWS is expected to culminate in a BiOp and ITS by early September.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the cause on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248,

254 (1936). In determining whether a stay is warranted, courts should balance the risk of hardship to the parties and evaluate the likelihood that a stay will serve the interests of judicial economy. *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005). If "there is even a fair possibility that the stay will work damage to someone else, the party seeking the stay must make out a clear case of hardship or inequity." *Lockyer*, 389 F.3d at 1112 (internal quotations omitted).

Contrary to Reclamation's assertions, granting a stay in this matter would harm Alliance by allowing Reclamation to continue engaging in unlawful behavior with no concrete end date or abatement measures in place. *See Consv. Council for Hawaii v. Nat'l Marine Fisheries Serv.*, 97 F. Supp. 3d 1210, 1232 (D. Haw. 2015) (declining to stay a case where consultation was set to conclude in the near future because "[s]uch an action would be advantageous to Defendants while treating [Plaintiffs] as if they had never brought an ESA challenge at all."). As previously discussed, a risk of future harm to bull trout remains until the remedies Alliance seeks are implemented. Although USFWS is predicted to issue a BiOp by September 6, 2020, it is uncertain whether an extension will occur or whether an ITS will be issued with the BiOp.

Additionally, it is possible that St. Mary Canal will be operational before the BiOp and/or ITS are issued, and Reclamation has no plan to suspend its operations

14

in the St. Mary Unit. Instead, Reclamation has explained that providing water to users in the Milk River basin is "critical". (Doc. 8 at 11.) Therefore, there is a possibility that bull trout and Alliance's interests will be harmed by Reclamation's operations if a stay is implemented. *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 188 (1978) ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities[.]"); *see also*, *Alliance for the Wild Rockies*, 200 F. Supp. 3d at 1130 ("Judicial resources will not be wasted to resolve this issue when the Federal Defendants only have delayed temporarily action to implement [the conduct at issue].").

Finally, Reclamation's argument that it will suffer hardship by having to litigate this case before a BiOp is completed is unpersuasive. Reclamation's claimed hardship is based on its need to "shift resources" away from participating in consultation so that it can effectively litigate this action. (Doc. 8 at 24.) The Ninth Circuit has previously found the requirements of litigation are insufficient to establish hardship. *See Lockyer*, 398 F.3d at 1112 ("[B]eing required to defend a suit, without more, does not constitute a clear case of hardship or inequity.") (internal quotation omitted). *See also*, *California Trout, Inc.*, 115 F. Supp. 3d at 1117 ("diverting staff attention from other activities does not sufficiently satisfy

15

the requirement of hardship or inequity."). The Court therefore denies Reclamation's alternative request for a stay.

## IV. Conclusion

Having considered Reclamation's motion, the Court determines that neither dismissal nor a stay of this matter is warranted.

Accordingly, **IT IS ORDERED** that Defendant's Motion to Dismiss or Stay (Doc. 7) is **DENIED**.

**IT IS ORDERED**.

DATED this 10th day August, 2020.

_____
Kathleen L. DeSoto
United States Magistrate Judge